UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, Cross Defendant, and Counter Defendant, | ) ) ) | Case No. 22-cv-2246 |
| v. | ) ) | Hon. Steven C. Seeger |
| BELLIN MEMORIAL HOSPITAL, INC., | ) ) ) ) | |
| Defendant, Cross Defendant, and Counter Claimant, | ) ) ) | |
| and | ) ) | |
| KINSEY & KINSEY, INC., | ) ) ) | |
| Defendant, Cross Claimant, and Counter Claimant. | ) ) ) ) | |

## MEMORANDUM OPINION AND ORDER

This case is a contract interpretation knot. The tangle started years ago, when Bellin Memorial Hospital hired Kinsey & Kinsey to upgrade its business management software. The upgrade did not go according to plan, to put it mildly. Kinsey & Kinsey promised to install a specific type of software, but it installed something else – without telling the client.

The bait-and-switch prompted Bellin to sue Kinsey & Kinsey and two of its employees in state court in Wisconsin. Kinsey & Kinsey's insurer, Philadelphia Indemnity, defended Kinsey & Kinsey and the two employees.

During trial, Bellin and Philadelphia Indemnity signed a settlement agreement that covered one of the two employees (only). Under the agreement, Bellin released one of the

Kinsey & Kinsey employees from liability. In return, Philadelphia Indemnity paid Bellin $1 million. The settlement agreement did not apply to Kinsey & Kinsey or to the other employee.

The settlement agreement contained a set-off provision, and that provision is the crux of this case. Basically, if Bellin won at trial, then the judgment *might* be offset by the $1 million that Philadelphia Indemnity had already shelled out. But the applicability of the set-off depended on what the judgment was *for*. The set-off applied only if the liability involved a covered claim.

Bellin prevailed at trial on one of the claims, for breach of contract. The state court entered a judgment in Bellin's favor for $750,000.

Since then, the parties have been at loggerheads about whether the set-off applies. That is, they disagree about whether Kinsey & Kinsey has to pay the $750,000 judgment in light of the set-off provision in the settlement agreement.

The insurance company (Philadelphia Indemnity) and the insured (Kinsey & Kinsey) see things the same way. They believe that the set-off applies, and that Kinsey & Kinsey does not owe Bellin anything because the amount of the judgment ($750,000) is less than the amount of the settlement ($1 million). Bellin has the opposite view. As Bellin sees it, the set-off does not apply because it prevailed on a breach-of-contract claim, which is not covered by the policy.

Philadelphia Indemnity ultimately filed the case at hand, seeking a declaratory judgment that it has no obligation to pay the $750,000 judgment. Kinsey & Kinsey (a nominal defendant) filed a counterclaim, but it seeks the same relief: a declaration that it owes nothing. Kinsey & Kinsey filed a crossclaim against Bellin, too. Bellin then filed a counterclaim against Philadelphia Indemnity (only), requesting a declaration that the set-off does not apply.

The procedural wrangling and tousled history created a motion-tangle. The knot has four strands. Philadelphia Indemnity and Bellin filed cross motions for judgment on the pleadings. Bellin moved to dismiss Kinsey & Kinsey's crossclaim. And Philadelphia Indemnity moved to dismiss Bellin's counterclaim for breach of contract.

The Court untangles the Gordian knot as follows. The set-off does not apply.

The Court grants Bellin's motion for judgment on the pleadings and denies Philadelphia Indemnity's motion for judgment on the pleadings. In the same vein, the Court grants Bellin's motion to dismiss Kinsey & Kinsey's crossclaim. Finally, the Court grants Philadelphia Indemnity's motion to dismiss Bellin's counterclaim for breach of contract.

## Background

The story begins almost a decade ago. Bellin Memorial Hospital, Inc. is a medical care provider in Green Bay, Wisconsin. In 2015, Bellin decided that its business management system needed an upgrade. *See* State Ct. Cplt., Ex. B to Cplt., at ¶ 17 (Dckt. No. 1-2). Bellin needed "something new and improved." *Id.*

Software created by Infor Lawson caught Bellin's eye. *Id.* at ¶ 19. One feature attracted its attention: a software product called Global Human Resources. *Id.* Global HR is a comprehensive software suite that manages a company's "people records." *See Global Human Resources*, Infor, https://www.infor.com/solutions/people/hcm/global-hr (last accessed Sept. 29, 2023).

It is not easy for a company to transition from one system to another. *See* State Ct. Cplt., Ex. B to Cplt., at ¶ 19 (Dckt. No. 1-2). Bellin has several thousand employees, with untold thousands of personnel records. *See* Kinsey & Kinsey's Counterclaim/Crossclaim, at ¶ 2 (Dckt. No. 10, at 5 of 11). A lot of data needed to migrate from the old system to the new one.

Bellin started looking for a consulting company to shepherd the migration.  *See* State Ct. Cplt., Ex. B to Cplt., at ¶ 20 (Dckt. No. 1-2).  That's when Kinsey & Kinsey, a software consulting firm, entered the picture.  *See* Kinsey & Kinsey's Counterclaim/Crossclaim, at ¶ 1 (Dckt. No. 10, at 5 of 11).

Bellin discussed the project with Brian Thome, a Kinsey & Kinsey consultant.  *See* State Ct. Cplt., Ex. B to Cplt., at ¶ 31 (Dckt. No. 1-2).  Bellin told Thome that Global HR was very important to Bellin.  *Id.* at ¶ 32.  Specifically, Bellin wanted to implement Global HR "before implementing other Infor Lawson modules."  *Id.*

Bellin ultimately hired Kinsey & Kinsey.  *Id.* at ¶ 37.  The parties cemented their relationship in a Master Service & Support Agreement.  *Id.*

Kinsey & Kinsey agreed to provide the services listed in the Agreement's Exhibit A and various addenda called Statements of Work.  *See* Master Agreement, Ex. 4 to Bellin's Answer & Counterclaim (Dckt. No. 43-1, at 36 of 254).  Exhibit A and the Statements of Work declared that Kinsey & Kinsey would install Global HR and train Bellin's employees to use it.  *Id.* at 50, 68–69 (identifying "Global Human Resource Structure" training as "[p]rivate [e]ducation provided by Kinsey," and "Install Global Human Resources" as the responsibility of "Kinsey – AIC").

Kinsey & Kinsey started work in November 2015.  *See* 10/7/21 State Ct. Order, Ex. 2 to Bellin's Answer (Dckt. No. 26, at 30 of 265).  But about nine months into the project, a Kinsey & Kinsey employee (Sharon Jordan) told Bellin bad news.  *Id.* at 31.  Kinsey & Kinsey never implemented Global HR.  *Id.*  Instead, Kinsey & Kinsey implemented something called S3, an older software.  *Id.*

Bellin called a meeting with the CEO of Kinsey & Kinsey, Brad Kinsey. *Id.* At the meeting, Bellin demanded an explanation. *Id.* In response, Mr. Kinsey apparently viewed the dissatisfied customer as a money-making opportunity. He submitted a new proposal to implement Global HR for an additional cost. *Id.*

That proposal landed like a ton of bricks, and the parties landed in state court. Bellin refused to pay a second time for something that it thought it already paid for. Bellin sued Kinsey & Kinsey, Brad Kinsey, and Brian Thome in the Circuit Court for Brown County, Wisconsin. *Id.* at 26.

Bellin brought three claims against all three defendants: (1) intentional misrepresentation/fraud; (2) negligent misrepresentation; and (3) Wisconsin Deceptive Trade Practices Act violations. *See* State Ct. Cplt., Ex. B to Cplt., at ¶¶ 70–100 (Dckt. No. 1-2). In addition, Bellin brought a breach-of-contract claim against Kinsey & Kinsey (only). *Id.* at ¶¶ 101–14.

Philadelphia Indemnity Insurance Company soon came on scene and entered the fray. *See* Cplt., at ¶¶ 11, 13 (Dckt. No. 1). Philadelphia Indemnity was Kinsey & Kinsey's insurance company. *Id.* at ¶ 9. The insurer defended Kinsey & Kinsey and the two employees in state court under a professional liability insurance policy. *Id.*

The policy provided coverage for a "wrongful act." Specifically, the policy required Philadelphia Indemnity to pay, up to the policy limit, all sums that Kinsey & Kinsey "shall become legally obligated to pay as damages resulting from any claim" during the policy period "arising out of a *wrongful act*." *See* Policy, Ex. A to Cplt. (Dckt. No. 1-1, at 29 at 86) (emphasis added).

The policy defined "wrongful act" as a "negligent act, error, or omission committed or alleged to have been committed by [Kinsey & Kinsey] or any person for whom [Kinsey & Kinsey] [is] legally responsible in the rendering of professional services." *Id.* at 32.

The policy contained a bunch of exclusions, too. One of the exclusions covered liabilities for breach of contract. *Id.* at 33. Exclusion H declared that the policy did not apply to claim expenses "arising out of" any "express warranties or guarantees or any liability" that Kinsey & Kinsey assumed "under contract," unless Kinsey & Kinsey "would have been legally liable in the absence of such contract." *Id.*

Finally, the policy stated that Philadelphia Indemnity would "not settle any claim without [Kinsey & Kinsey's] consent." *Id.* at 29.

In state court, Kinsey & Kinsey and the two employees moved for an order declaring that a limited liability provision in the Master Agreement restricted Bellin's potential recovery to $100,000. *See* 10/7/21 State Ct. Order, Ex. 2 to Bellin's Answer (Dckt. No. 26, at 26, 33 of 265).

The state court ruled that the limited liability provision did not apply. When the state court described the breach-of-contract claim, the court talked about non-performance – plain and simple – without mentioning any negligent act.

The state court explained that a Master Agreement provision generally limited Bellin's recovery to $100,000. *Id.* at 33. But the provision had an exception. *Id.* The $100,000 recovery ceiling did not apply to "Client Losses." *Id.* at 33–34. "Client Losses" included expenses that Bellin incurred from "any material breach" of the Master Agreement "by Kinsey or Kinsey's personnel." *Id.* at 34. So, the $100,000 cap did not apply if Kinsey & Kinsey breached the contract.

6

The state court ruled that the limited liability provision did not apply to Bellin's breach-of-contract claim. It reasoned that Kinsey & Kinsey "failed to implement [Global HR] and instead implemented S3, an older version of the software. They thus did not provide a service related to the implementation of Infor/Lawson Software that they agreed to provide under the Master Agreement. Because Kinsey & Kinsey agreed to implement [Global HR] under the Master Agreement and it failed to do so, it materially breached the Master Agreement and the Statement of Work." *Id.* at 34–35.

Basically, Bellin claimed that Kinsey & Kinsey had breached the contract, which means that the breach was a "Client Loss[]" under the Master Agreement. *Id.* at 35 ("Because Kinsey & Kinsey materially breached the Master Agreement, the breach is a Client Loss."). And "because the breach [was] a Client Loss," Bellin's recovery was not limited to $100,000. *Id.*

The case proceeded to trial. At the end of the first week, the state court granted Bellin's oral motion for a directed verdict on its breach-of-contract claim against Kinsey & Kinsey. *See* 11/19/21 State Ct. Minutes, Ex. 1 to Bellin's Reply (Dckt. No. 59-1, at 3 of 45); 11/19/21 State Ct. Trial Tr. (Dckt. No. 78-1, at 13 of 13).[1] The state court made an oral ruling, without a written opinion. The state court left the amount of damages on the breach-of-contract claim for the jury.

Over the ensuing weekend, Bellin and Philadelphia Indemnity reached a partial settlement. They agreed to settle Bellin's claims against Thome (only), meaning one of the two employees. *See* 11/22/21 State Ct. Trial Tr., Ex. 1 to Bellin's Answer (Dckt. No. 26, at 14–15 of

---

[1] When reviewing the filings, the Court noticed that the parties did not file a copy of the transcript from the hearing when the state court granted the motion for directed verdict. So this Court directed the parties to file the transcript. *See* 9/25/23 Order (Dckt. No. 77). The parties promptly did so. *See* 11/19/21 State Ct. Trial Tr. (Dckt. No. 78-1); *see also* Submission by Bellin Mem. Hospital, at 1 (Dckt. No. 78) ("Bellin made an oral motion for directed verdict. No briefing was filed in connection with Bellin's oral motion. The state court granted Bellin's oral motion from the bench. No written order was made."); Submission by Philadelphia Indemnity and Kinsey & Kinsey (Dckt. No. 79). The Court appreciated the prompt submissions.

265).  Philadelphia Indemnity paid Bellin $1 million.  *See* Settlement, at ¶ 1 (Dckt. No. 4).  In

return, Bellin released Thome from liability.  *Id.*

The settlement did not release Kinsey & Kinsey or Brad Kinsey from liability.  *Id.* at ¶ 8

(stating that Bellin "expressly reserves the balance of its entire cause of action," including claims

against "Kinsey & Kinsey, Inc. and Brad Kinsey").  So Bellin's claims against Kinsey & Kinsey

and the other employee (Brad Kinsey) went forward.

The settlement agreement also contained a set-off provision.  The set-off basically

covered whether, when, and how Philadelphia Indemnity would get credit for the $1 million

settlement in the state court case against Kinsey & Kinsey and the second employee.

Specifically, the parties agreed that the $1 million would "provide a set-off to Kinsey &

Kinsey, Inc. and Brad Kinsey" to the "extent that either of them would incur any liability" to

Bellin within the "scope of coverage provided under" the policy.  *Id.* ("Nevertheless, it is

understood that reference to the balance of Releasor's cause of action is understood by the

Settling Parties to provide a set-off to Kinsey & Kinsey, Inc. and Brad Kinsey for the Settlement

Amount to the extent that either of them would incur any liability to Releasor [*i.e.*, Bellin] within

the scope of coverage provided under [the policy] in the action pending in the Brown County

Circuit Court styled Bellin Memorial Hospital, Inc. v. Brian Thome, et al.").

That provision is a bit of a mouthful.  The main idea is that the $1 million might provide

a set-off for the then-remaining claims against the two non-settling defendants, Kinsey & Kinsey

and Brad Kinsey.  Basically, the applicability of the set-off depended on whether Bellin

prevailed at trial, and if so, for what.

More specifically, the key question is whether Bellin prevailed on a claim that was

covered by the policy.  If Bellin prevailed on a claim "within the scope of coverage," then the

insurance company would get credit for the $1 million that it already paid under the policy. But if Bellin prevailed on a claim that was *not* "within the scope of coverage," then the set-off would not apply, and Bellin could recover the entire amount of the judgment.

Kinsey & Kinsey and Brad Kinsey did not consent to the settlement. *See* 11/22/21 State Ct. Tr., Ex. 1 to Bellin's Answer (Dckt. No. 26, at 17 of 265).

The lack of consent raised the possibility that the insureds might bring a claim against Philadelphia Indemnity, for breaching the provision requiring consent to a settlement. Bellin did not want to get drawn into a dispute between the insurer and the insureds. To protect Bellin, the settlement agreement provided that Bellin would have no obligation to defend Philadelphia Indemnity "from a contractual, bad faith, or any other claim asserted by Brad Kinsey or Kinsey & Kinsey, Inc. against the Settling Parties other than a contribution claim." *Id.* at ¶ 10; *see also id.* at ¶ 13.[2]

When trial resumed, Philadelphia Indemnity and Bellin told the state court about the settlement agreement. *Id.* at 14–15. Bellin then voluntarily dismissed its negligent misrepresentation claim against Brad Kinsey and Kinsey & Kinsey. *Id.* at 18. So the negligence-based claim fell by the wayside.

By dropping the negligence-based claim, Bellin dropped a claim that fell within the scope of coverage under the policy (because the policy covered negligence). Bellin thought that dropping the negligence-based claim would ensure that the set-off under the settlement

---

[2] *See* Bellin Resp., at 1 (Dckt. No. 70) ("Bellin entered into a settlement agreement with PIIC anticipating that PIIC's actions might cause a dispute among PIIC and certain of its insureds. Not all of PIIC's insureds consented to the settlement, and the non-settling insureds had consent rights to any settlement that PIIC entered into. Knowing that the non-settling insureds might later pursue legal action against PIIC, Bellin insisted on certain protections in the agreement to ensure that Bellin would not be financially responsible for defending PIIC in any future disputes with its insureds.").

agreement would not apply to the state court judgment.  Basically, Bellin dropped a covered claim, and at that point, only non-covered claims were left.[3]

When it came time to deliberate, the jury had to decide two claims brought by Bellin against Kinsey & Kinsey and Brad Kinsey:  (1) misrepresentation/intentional deceit; and (2) misleading representations in violation of Wisconsin's Deceptive Trade Practices Act.  *See* Jury Verdict Form, Ex. 3 to Bellin's Answer (Dckt. No. 26, at 37, 40 of 265).  The jury also needed to decide the amount of damages on the breach-of-contract claim, because the trial court had entered directed verdict for Bellin on that claim.  *Id.* at 43.

The jury ultimately found that Kinsey & Kinsey and Brad Kinsey were not liable for misrepresentation or Deceptive Trade Practices Act violations.  *Id.* at 37–38, 40–41.

On the breach-of-contract claim, the jury awarded Bellin $1.39 million.  *Id.* at 43.  The state court later reduced the award to $750,000.[4]  *See* State Ct. Judgment, Ex. D. to Cplt. (Dckt.

---

[3]  *See* Bellin Resp., at 2 (Dckt. No. 70) ("Bellin took additional action to minimize potential disputes among PIIC and its insureds and to limit PIIC's potential exposure.  Bellin's claims against PIIC's insureds included breach of contract and pre-contract negligent and intentional misrepresentation.  Among these claims, only the claim for pre-contract negligent misrepresentation would be indemnified by PIIC. . . .  To avoid this mess [meaning a dispute between the insurer and the insured], Bellin voluntarily dismissed its negligent misrepresentation claims against the remaining insureds.  This dismissal eliminated Bellin's remaining insurable claims.").

[4]  In its order reducing the jury award, the state court wrote:  "On November 23, 2021, *the jury* returned a verdict in Bellin's favor only for its breach of contract claim against Kinsey & Kinsey.  *The jury* found that Kinsey & Kinsey and Bellin came to an agreement that Kinsey & Kinsey would install and implement Infor/Lawson's Global Human Resources software for Bellin.  *The jury* also found that Kinsey & Kinsey failed to perform a duty under the agreement."  *See* 2/22/22 Order, Ex. 3 to Bellin's Reply (Dckt. No. 59-1, at 28 of 45) (emphasis added).  This Court assumes that the state court's phraseology was a bit imprecise.  The state court granted directed verdict to Bellin on the breach-of-contract claim, as reflected in the minutes and in the trial transcript.  *See* 11/19/21 State Ct. Minutes, Ex. 1 to Bellin's Reply (Dckt. No. 59-1, at 3 of 45) ("Court grants motion for directive [sic] verdict on Ct 4"); *see* 11/19/21 State Ct. Trial Tr. (Dckt. No. 78-1); *see also* State Ct. Cplt., Ex. B to Cplt., at ¶¶ 101–14 (Dckt. No. 1-2) ("COUNT IV – Breach of Contract").  The jury did not decide the question of liability on the breach-of-contract claim.  The jury verdict form did not ask the jury to make a finding on liability on the breach-of-contract claim.  *See* Jury Verdict Form, Ex. 3 to Bellin's Answer (Dckt. No. 26, at 42 of 265).  In fact, the jury verdict form included a *typewritten* answer – "Yes" – when it came to the breach-of-contract claim.  *Id.*  In their filings before this Court, the parties agree that the state trial court – not the jury – resolved the breach-of-contract claim by granting a directed verdict to Bellin.  *See* Submission by

No. 1-4, at 25 of 25).  The state court entered judgment for $750,000, plus costs, against Kinsey & Kinsey.  *Id.*

With judgment in hand, Bellin took steps to collect it.  Bellin registered the judgment in the Circuit Court of DuPage County, Illinois.  *See* Kinsey & Kinsey's Answer, at ¶ 18 (Dckt. No. 10, at 3 of 11).  Kinsey & Kinsey is based in DuPage County.

Bellin also filed citations to discover assets.  *See* Citation, Ex. A to Kinsey & Kinsey's Counterclaim/Crossclaim (Dckt. No. 10-1, at 3 of 29).  A citation to discover assets allows a judgment creditor to "discover and recover" a debtor's assets to satisfy a judgment.  *See Pontikes v. Perazic*, 692 N.E.2d 712, 716 (Ill. App. Ct. 1998).

Bellin also served a citation to discover assets on Kinsey & Kinsey's bank.  *See* Kinsey & Kinsey's Counterclaim/Crossclaim, at ¶ 17 (Dckt. No. 10, at 8 of 11).  In response to the citation, the bank froze Kinsey & Kinsey's funds.  *Id.* at ¶ 19.

To stave off the collection efforts, Philadelphia Indemnity filed the declaratory judgment action at hand.  *See* Cplt., at ¶ 1 (Dckt. No. 1).  Philadelphia Indemnity named Bellin as a defendant, and Kinsey & Kinsey as a nominal defendant.  *Id.* at ¶¶ 3–4.

Philadelphia Indemnity seeks a declaration that the "Bellin/Kinsey judgment is an insured claim" under the policy, and that the set-off provision is enforceable.  *Id.* at ¶ 22.  In other words, Philadelphia Indemnity thinks that Bellin's attempt to collect the $750,000 judgment is a double dip.

As the insurance company sees it, the $750,000 judgment falls within the set-off provision because it was a "covered claim."  *See* Philadelphia's Mem., at 5 (Dckt. No. 51).  In its

---

Bellin Mem. Hospital, at 1 (Dckt. No. 78); Submission by Philadelphia Indemnity and Kinsey & Kinsey, at 1 (Dckt. No. 79).  This Court flags it simply to help the reader avoid potential confusion.

view, the $1,000,000 offsets the $750,000 judgment, which means that Kinsey & Kinsey owes nothing.

Kinsey & Kinsey (the nominal defendant) piled on with claims of its own. It basically said: Ditto. The insurance company (Philadelphia Indemnity) and the insured (Kinsey & Kinsey) agree that Kinsey & Kinsey owes nothing.

Specifically, Kinsey & Kinsey filed a counterclaim against Philadelphia Indemnity and a crossclaim against co-defendant Bellin.[5] *See* Kinsey & Kinsey's Counterclaim/Crossclaim, at 4 (Dckt. No. 10). It asked for "a declaratory judgment that the judgment of the Brown County Wisconsin court, in the amount of $750,000 plus costs and interest, is subject to a setoff of $1,000,000 for the Thome settlement, and that therefore, Bellin has no right to collect more." *Id.* at ¶ 29. Kinsey & Kinsey also sought an injunction "barring any further efforts to enforce or collect on the judgment." *Id.*

Bellin returned fire by filing a counterclaim against Philadelphia Indemnity, alleging a breach of the settlement agreement. *See* Bellin's Counterclaim, at 22–25, ¶¶ 46–60 (Dckt. No. 43). Bellin invoked the implied covenant of good faith and fair dealing. According to Bellin, "[i]nstead of cooperating in the performance of the Settlement Agreement, Philadelphia has engaged in conduct, communications, and action that has hindered and obstructed Bellin's right to enforce the Wisconsin Judgment against Kinsey and collect the money that Bellin is owed by

---

[5] After Kinsey & Kinsey filed its counter/crossclaim, Kinsey & Kinsey filed a motion for a temporary restraining order. *See* TRO Mtn., at 2 (Dckt. No. 11). It asked this Court to enjoin Bellin from taking any further action to enforce the Wisconsin state judgment or the citations to discover assets. *Id.* Sometime later, Kinsey & Kinsey filed for Chapter 11 bankruptcy. *See* Notice of Bankruptcy (Dckt. No. 31). That triggered an automatic stay of the claims against Kinsey & Kinsey. *See* Min. Entry (Dckt. No. 32). Based on the automatic stay, this Court denied Kinsey & Kinsey's motion for a temporary restraining order as moot. *Id.* Later, Bellin filed an unopposed motion for relief from the automatic stay in bankruptcy court. *See* Statement, at 1 (Dckt. No. 33). The bankruptcy court lifted the automatic stay and expressly allowed this case to proceed. *See* Notice, at 1 (Dckt. No. 35). So this Court set a briefing schedule. *See* Min. Entry (Dckt. No. 37).

Kinsey." *Id.* at ¶ 52. In other words, "Philadelphia has not complied with the covenant of good faith and fair dealing or the duty of cooperation." *Id.* at ¶ 54.

In its prayer for relief, Bellin requested a declaration that the Wisconsin judgment "is not within the scope" of the policy and that Kinsey & Kinsey is "not entitled to a set-off" under the settlement agreement. *Id.* at 25.

The dispute led to four pending motions, turning the docket into a big vat of procedural spaghetti. Philadelphia Indemnity and Bellin filed cross motions for judgment on the pleadings. Bellin also moved to dismiss Kinsey & Kinsey's crossclaim, raising the same basic issue. Finally, Philadelphia Indemnity moved to dismiss Bellin's counterclaim for breach of contract.

## Legal Standard

The motions fill two buckets: (1) motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c); and (2) motions to dismiss under Rule 12(b)(6).

Although different in name, the motions are similar at heart. "The only difference between a motion for judgment on the pleadings and a motion to dismiss is timing; the standard is the same." *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020).

"When a [party] moves for judgment on the pleadings, the motion should not be granted unless it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position, and that the [moving party] is entitled to relief." *Id.* (citation omitted). The Court must view the facts and inferences in the light most favorable to the non-moving party. *Id.*

In the same vein, to survive a motion to dismiss, a plaintiff must "allege enough facts to state a claim to relief that is plausible on its face." *Webber v. Armslist LLC*, 70 F.4th 945, 958 (7th Cir. 2023) (cleaned up). A claim is facially plausible when the plaintiff "pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (cleaned up).

When a district court considers both types of motions, it can rest its decision only on "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 636 (7th Cir. 2021) (cleaned up). Matters of public record are proper for judicial notice. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (cleaned up); *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991).

Here, the complaint relied on the insurance policy and the settlement agreement, so both are fair game on the pending motions. *See* Cplt. (Dckt. No. 1). The Court also can take judicial notice of the filings and rulings in state court, which the parties attached to their pleadings and other filings. The parties agree that there are no facts in dispute when it comes to the declaratory judgment claims. *See* Joint Initial Status Report, at 2 (Dckt. No. 36).

## Analysis

The Court will tackle the four pending motions in three steps. The Court will start with the two cross motions for judgment on the pleadings, filed by Philadelphia Indemnity and Bellin. Next, the Court will turn to Bellin's motion to dismiss Kinsey & Kinsey's crossclaim, which involves the same basic issue. The Court will end with Philadelphia Indemnity's motion to dismiss Bellin's counterclaim for breach of contract.

## I.    Cross Motions for Judgment on the Pleadings

The Court begins with the cross motions for judgment on the pleadings between Philadelphia Indemnity and Bellin.

The issue boils down to whether the state court judgment is a "covered claim" within the meaning of the policy. Answering that question requires the Court to triangulate between the state court judgment, the insurance policy, and the settlement agreement.

If the state court judgment is a covered claim, then the $1 million set-off applies under the settlement agreement. In that case, Philadelphia Indemnity and Kinsey & Kinsey would owe Bellin nothing, because the amount of the set-off ($1 million) is greater than the judgment ($750,000). On the other hand, if the state court judgment is not a covered claim, then the $1 million set-off would not apply, and Bellin would have a right to the full $750,000.[6]

The Court will apply Illinois law. The parties agree that there is no material difference between the law of Illinois (Kinsey & Kinsey's home) and Wisconsin (Bellin's home). *See Philadelphia's Mem.*, at 6 (Dckt. No. 51) ("[T]here is no material difference between the rules of construction that would be applied in Wisconsin versus Illinois."); Bellin's Reply, at 17 n.6 (Dckt. No. 59) ("Wisconsin law and Illinois law are substantially the same regarding the rules of construction for an insurance policy."). Since there is no conflict, the Court will apply Illinois law. *See Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020).[7]

The Court must "take the motions one at a time," construing all facts and drawing all reasonable inferences in favor of the non-moving party. *See Black Earth Meat Mkt., LLC v. Vill.*

---

[6] Bellin's request for a declaratory judgment appears in its breach of contract prayer for relief. *See* Bellin's Answer & Counterclaim, at 25 (Dckt. No. 43). But Philadelphia Indemnity argues that Bellin's declaratory judgment request has "nothing to do with any damage to Bellin from an alleged breach of contract," and is "instead addressed separately and directly by the Part[ies]' pending cross motions for judgment on the pleadings." *See* Philadelphia's Mtn. to Dismiss, at 12 (Dckt. No. 57). The Court agrees that the issue is addressed by the cross motions for judgment on the pleadings.

[7] "Because this is a diversity action, the district court first ha[s] to determine which state's substantive law [should] govern this dispute." *See Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 872 (7th Cir. 2000). Illinois choice-of-law rules govern. *Id.* The policy contains no choice-of-law provision, so ordinary choice-of-law rules apply. *See Costello v. Liberty Mut. Fire Ins. Co.*, 876 N.E.2d 115, 120 (Ill. App. Ct. 2007). Illinois courts apply Illinois law "unless an actual conflict with another state's law is shown." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020).

*of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016). The Court will start with Bellin's motion for judgment on the pleadings. So the Court will view the facts and make inferences in Philadelphia Indemnity's favor as the non-movant. And then the Court will do the same thing in the opposite direction for the other motion.

An insurance policy is a contract, so traditional contract interpretation rules apply. *See Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1003 (Ill. 2010). The Court must "give effect to the intention of the parties, as expressed in the policy language." *Id.*

The text of the policy defines the scope of the policy, and courts must uphold the plain meaning of the text. "If the language is unambiguous, the provision will be applied as written, unless it contravenes public policy." *Id.* at 1003–04.

A policy provision is "not rendered ambiguous simply because the parties disagree as to its meaning." *Id.* at 1004. An ambiguity exists only if language "is susceptible to more than one reasonable interpretation." *Id.* In sum, the policy's text begins the Court's inquiry. It might end it too.

Under the policy, Philadelphia Indemnity agreed to cover Kinsey & Kinsey for liabilities incurred from claims "arising out of a wrongful act." *See* Policy, Ex. A to Cplt. (Dckt. No. 1-1, at 29 of 86). A "wrongful act" is a "negligent act, error, or omission." *Id.* at 32.

The definition raises a threshold question. The phrase includes one adjective ("negligent"), followed by three nouns ("act, error, or omission"). The question is whether "negligent" modifies only "act," or whether it also modifies "error" and "omission."

An interpretive canon gives the answer. The series-qualifier canon provides that a modifier beginning a "series of terms modifies all the terms." *United States v. Laraneta*, 700 F.3d 983, 989 (7th Cir. 2012). The terms must appear in a "straightforward, parallel

16

construction" for the canon to apply. *See Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (citation omitted). At its core, the canon captures a sentence's "most natural reading." *Id.*; *see also* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) ("The phrase is often repeated: *unreasonable searches and seizures*. Does the adjective *unreasonable* qualify the noun *seizures* as well as the noun *searches*? Yes, as a matter of common English.") (emphasis in original).

The policy's syntax is "straightforward" and "parallel." *See Duguid*, 141 S. Ct. at 1169. So the most natural reading is that "negligent" modifies "act," "error," and "omission." In other words, the policy covers negligent acts, negligent errors, and negligent omissions.[8]

Other courts have landed in the same place after facing the same question. *See, e.g.*, *Ill. State Bar Ass'n Mut. Ins. Co. v. Cavenagh*, 983 N.E.2d 468, 476 (Ill. App. Ct. 2012); *Cambridge Mut. Fire Ins. Co. v. 1347-49 N. Sedgwick Condo. Ass'n*, 2013 WL 271222, at *4 (N.D. Ill. 2013); *TIG Ins. Co. v. Joe Rizza Lincoln-Mercury, Inc.*, 2002 WL 406982, at *9 (N.D. Ill. 2002) ("It would be illogical for an endorsement to limit coverage to negligent acts, but to provide coverage for intentional omissions or errors."); *see also Cashman v. Bayland Bldgs., Inc.*, 2016 WL 2766643, at *6 (E.D. Wis. 2016).

The next question is whether the Wisconsin judgment for breach of contract arose out of a "wrongful act" – that is, a negligent act, negligent error, or negligent omission. If it did, then the judgment is within the scope of coverage under the policy. And if the judgment is within the scope of coverage, then the set-off applies.

Generally, insurance law "fixes a line of demarcation between negligent acts and breaches of contract." *Hartford Cas. Ins. Co. v. Karlin, Fleisher & Falkenberg, LLC*, 822 F.3d

---

[8] Philadelphia doesn't seem to dispute this reading. *See* Philadelphia's Mem., at 10 (Dckt. No. 51) (arguing that "a breach of contract precipitated by negligence is indeed insurable").

17

358, 359 (7th Cir. 2016) (Illinois law) (cleaned up); *see also* 7A Steven Plitt *et al.*, Couch on

Insurance § 103:19 (3d ed. 2023) ("[L]iability based upon contract is generally excluded from

[insurance] coverage."). The line exists to stave off a moral hazard problem. *Id.* at 359–60.

"It would be absurd for an insurance company to insure against a breach of contract to,

say, buy a car, for then the insured could take delivery of the car, refuse to pay for it, and require

the insurer to reimburse the seller for the car's sale price and the cost of litigation." *Id.* at 360;

*see also Krueger Int'l, Inc. v. Royal Indemnity Co*, 481 F.3d 993, 996 (7th Cir. 2007)

("[I]nsurance policies are presumed not to insure against liability for breach of contract. The

reason is the severe 'moral hazard' problem to which such insurance would often give rise. The

term refers to the incentive that insurance can create to commit the act insured against, since the

cost is shifted to the insurance company. An example is the incentive to burn down one's house

if the house is insured for more than its value to the owner.") (applying Wisconsin law); *Baylor

Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co.*, 987 F.2d 415, 420 (7th Cir. 1993)

("We dare not imagine the creative legal theories treading just short of malpractice and frivolity

that could seek to transform contract obligations into insured events. There is a well-recognized

line of demarcation between negligent acts and breaches of contract.").

Against that backdrop, the question is whether the state court judgment arose out of a

"wrongful act," meaning a negligent act, negligent error, or negligent omission. And more

specifically, the question is whether a negligent act, negligent error, or negligent omission gave

rise to the judgment for breach of contract. If the judgment for breach of contract arose out of

negligence, then it is a covered claim. But if not, then the breach of contract is not a covered

claim.

Bellin called the claim a breach-of-contract claim in state court. That's telling, but not dispositive. It would be a little too easy to stop the analysis then and there. Coverage does not turn on labels, meaning the names and titles that a plaintiff uses when suing an insured. The "question of coverage should not hinge on the draftsmanship skills or whims of the plaintiff in the underlying action." *Am. Econ. Ins. Co. v. Holabird & Root*, 886 N.E.2d 1166, 1171 (Ill. App. Ct. 2008) (citation omitted); *see also Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co.*, 987 F.2d 415, 420 n.8 (7th Cir. 1993) (Indiana law). Insurance coverage turns on the package, not the packaging.

The Court needs to look at what happened in state court, and take a close look at the "basis of [Bellin's] claim," including the underlying events. *See Hartford*, 882 F.3d at 360; *see also Crum & Forster Specialty Ins. Co. v. DVO, Inc.*, 939 F.3d 852, 855 (7th Cir. 2019) (Wisconsin law) (noting that courts must "focus on the incident that allegedly gave rise to the coverage, not the theory of liability" when deciding the scope of coverage).

When deciding the basis of the claim, the underlying complaint against the insured provides a starting point, but it is not the end of the road. The complaint against the insured does loom large when deciding the duty to defend. An insurer has a duty to defend an insured if the facts alleged in the underlying complaint potentially fall within the policy. *See Crum & Forster Managers Corp. v. Resol. Tr. Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1993). Basically, an insurer has a duty to defend if it *might* have a duty to indemnify.

But an insurer's duty to indemnify is narrower than the duty to defend. *Id.* It "arises only when the insured becomes legally obligated to pay damages in the underlying action that gives rise to a claim under the policy." *Johnson v. State Farm Fire & Cas. Co.*, 806 N.E.2d 223, 227

(Ill. App. Ct. 2004). The inquiry is whether liability was "*actually*" within the policy's coverage. *Id.* (emphasis in original).

So the Court looks at what actually happened in the state court case, after Bellin filed suit against Kinsey & Kinsey. As a starting point, recall the state court's pretrial order about the Master Agreement's liability cap. Kinsey & Kinsey, Thome, and Brad Kinsey moved for an order declaring that a limited liability provision in the Master Agreement restricted Bellin's potential recovery to $100,000. *See* 10/7/21 State Ct. Order, Ex. 2 to Bellin's Answer (Dckt. No. 26, at 26, 33 of 265).

The state court ruled that the limited liability provision was inapplicable, and it described the case as a run-of-the-mill breach-of-contract claim about non-performance. "Defendants failed to implement [Global HR] and instead implemented S3, an older version of the software. They thus did not provide a service related to the implementation of Infor/Lawson Software that they agreed to provide under the Master Agreement. Because Kinsey & Kinsey agreed to implement [Global HR] under the Master Agreement and it failed to do so, it materially breached the Master Agreement and the Statement of Work." *Id.* at 34–35.

The state court later granted Bellin's motion for directed verdict on that claim. *See* 11/19/21 State Ct. Trial Tr. (Dckt. No. 78-1, at 13 of 13). And once again, the state court described the claim as an ordinary breach-of-contract claim about a failure to perform. *Id.* Indeed, before deciding the question, the state court asked whether there was evidence that Mr. Kinsey "believed that he no longer had" an "obligation" to install Global HR. *Id.* at 10. In other words, the state court seemed to be curious about whether testimony supported the notion that Mr. Kinsey was confused about his contractual obligations. Mr. Kinsey's counsel responded that he was "not aware" of any such testimony. *Id.*

20

There is not one crumb in the state court's analysis supporting the idea that the court thought that the breach of contract occurred due to negligence. The state court found a duty, and a breach. That is, Kinsey & Kinsey agreed to implement Global HR in the Master Agreement, and breached that agreement by installing an older version of the software. The state court did not hang its hat on any negligent act when it found non-performance.

And later, when the state court reduced the damages award, the state court succinctly summarized the grounds for liability as follows: Kinsey & Kinsey "failed to perform a duty under the agreement." *See* 2/22/22 State Ct. Order, Ex. 3 to Bellin's Reply (Dckt. No. 59-1, at 28 of 45).

Importantly, the state court did not rest its decision on a negligent act. That is, the state court did not conclude that Kinsey & Kinsey breached the contract by doing something negligently – like, say, accidentally overwriting the right software with the wrong software. Kinsey & Kinsey didn't fail to perform because of negligence. Kinsey & Kinsey simply failed to perform. *See* 10/7/21 State Ct. Order, Ex. 2 to Bellin's Answer (Dckt. No. 26, at 34–35 of 265) ("Because Kinsey & Kinsey agreed to implement GHR under the Master Agreement and it failed to do so, it materially breached the Master Agreement and the Statement of Work.").

In sum, there is no indication in the state court case that the judgment against Kinsey & Kinsey arose from a negligent act, negligent error, or negligent omission. Accordingly, the state court judgment does not involve a covered claim within the meaning of the policy. So the set-off does not apply under the settlement agreement.

The Seventh Circuit landed in the same place in *Hartford*. *See Hartford*, 822 F.3d at 359. There, an attorney told his two law firms that, upon retirement, he was contractually entitled to a

payout for his unused vacation days. *Id.* at 358–59. The firms did not pay. *Id.* at 359. The attorney sued the firms in state court, alleging breach of contract. *Id.*

In response, the law firms sent the attorney's complaint to their insurance company, seeking coverage. *Id.* The insurer sued the law firms in federal court, seeking a declaration that the policy did not cover the attorney's claim because the policy limited coverage to liability arising out of negligence. *Id.*

The Seventh Circuit agreed that the policy did not cover the attorney's claim. *Id.* at 361. "The basis of [the attorney's] claim was not that he had been underpaid as the result of a negligent act, as would have been the case had the company, for example, through carelessness mailed the money due him to a different person and the money had never been recovered because the recipient had fled with it to North Korea." *Id.* at 360. Rather, the attorney claimed that the firms owed him money "by virtue of his employment contract." *Id.*

So too here. Bellin prevailed on a breach-of-contract claim. There is nothing in the state court record suggesting that Kinsey & Kinsey breached the contract through negligence. That is, the state court did not enter judgment against Kinsey & Kinsey because it committed a negligent act that led to a breach of contract. Instead, the state court simply held that Kinsey & Kinsey breached the contract because it did not deliver what it promised to deliver.

Philadelphia Indemnity resists this conclusion. It urges the Court to consider the negligent acts alleged in the state court complaint. *See* Philadelphia's Mem., at 13 (Dckt. No. 51).

True, the breach-of-contract count in the state court complaint incorporated by reference the earlier paragraphs. *See* State Ct. Cplt., Ex. B to Cplt., at ¶ 101 (Dckt. No. 1-2). And at least one of those paragraphs accused Kinsey & Kinsey of negligence. *See, e.g.*, *id.* at ¶ 5

22

("Defendants either . . . knew that they were not experts and did not have the capability to successfully implement Global HR software for Bellin . . . [or] were negligent").[9]

Those allegations may have triggered Philadelphia Indemnity's duty to defend. *See Crum*, 620 N.E.2d at 1079. But an insurer's duty to indemnify its insured is "limited to what the plaintiff *proves*." *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 539 (7th Cir. 2006) (emphasis added).

Here, nothing in the state court record suggests that Bellin proved negligence. The record suggests the opposite: Bellin proved non-performance, plain and simple. The state court granted a directed verdict without mentioning even a whiff of negligence. Even when viewed in a light favorable to Philadelphia Indemnity and Kinsey & Kinsey, the state court judgment did not involve a "wrongful act" because it did not arise from a negligent act, negligent error, or negligent omission.[10]

Philadelphia Indemnity latches on to paragraphs of the state court complaint that accused Kinsey & Kinsey of breaching professional standards. *See* Philadelphia's Mem., at 13–14 (Dckt. No. 51). And at times, Philadelphia Indemnity seems to conflate a breach of professional standards with negligence. A breach of professional standards *can be* negligence, the argument goes, so a breach of professional standards *must be* negligence.

---

[9] Paragraph eight of the state court complaint accused Kinsey & Kinsey of making "misrepresentations." At one point, Bellin had a negligent misrepresentation claim, but it voluntarily dismissed that claim before the case went to the jury. So the jury did not decide the case in Bellin's favor based on a negligent misrepresentation claim.

[10] Piping in, Kinsey & Kinsey argues that because Philadelphia agreed to defend Kinsey & Kinsey without a reservation of rights letter, "the lawsuit is deemed covered." *See* Kinsey & Kinsey's Resp., at 5 (Dckt. No. 60). According to Kinsey & Kinsey, "[i]n Illinois it is very well established, and not a topic of serious dispute, that if an insurer defends a lawsuit, and fails to either issue a reservation of rights or file a declaratory judgment action seeking a ruling that there is no coverage, the lawsuit is deemed covered, as any potential coverage defenses are waived." *Id.* But Philadelphia Indemnity – the insurer – is not contesting coverage. Bellin is.

But "can be" and "must be" are very different things. The fact that a breach of professional standards *can* be negligence does not mean that a breach of professional standards *must be* negligence. Not every breach of professional standards involves negligence. So pointing to paragraphs of the state court complaint about breaching professional standards does not get Philadelphia Indemnity very far.

And again, the state court complaint is not controlling in any event. What matters is what Bellin proved, not simply what it alleged. That is, the existence of a duty to indemnify turns on whether Bellin proved a wrongful (negligent) act. Bellin did not. Bellin proved a breach of contract, not a breach of a duty of care in tort.

There is a second, independent reason why the state court judgment is beyond the policy's scope: it falls within an exclusion.

An insurance policy exclusion "tak[es] out" "events otherwise included within the defined scope of coverage." *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1094 (Ill. 2007) (citation omitted).

Here, Exclusion H declared that the policy did not apply to claims arising out of any "express warranties or guarantees or any liability" that Kinsey & Kinsey assumed "under contract" unless Kinsey & Kinsey "would have been legally liable in the absence of such contract." *See* Policy, Ex. A to Cplt. (Dckt. No. 1-1, at 33 of 86).

To recap, the state court found that "Defendants failed to implement [Global HR] and instead implemented S3, an older version of the software. They thus did not provide a service related to the implementation of Infor/Lawson Software that they agreed to provide under the Master Agreement. Because Kinsey & Kinsey agreed to implement [Global HR] under the Master Agreement and it failed to do so, it materially breached the Master Agreement and the

Statement of Work." *See* 10/7/21 State Ct. Order, Ex. 2 to Bellin's Answer (Dckt. No. 26, at 34–35 of 265).

If the Master Agreement did not exist, Kinsey & Kinsey would not have been legally obliged to install Global HR. There is no common law duty for one company to install a software program for another company. The contract created the duty, and Kinsey & Kinsey did not breach any duty independent of the contract. So Kinsey & Kinsey would not have had any liability without the contract.

Seeing things differently,[11] Philadelphia Indemnity argues that, even without the Master Agreement, Kinsey & Kinsey would have been held to a standard of reasonableness when it installed software for Bellin. *See* Philadelphia's Reply, at 8 (Dckt. No. 68). That's counterfactual – Kinsey & Kinsey would not have installed software for Bellin *without* a contract.

What's more, the state court never found that Kinsey & Kinsey breached a standard of reasonableness. It held that Kinsey & Kinsey "did not provide a service" that it "agreed to provide." *See* 10/7/21 State Ct. Order, Ex. 2 to Bellin's Answer (Dckt. No. 26, at 34–35 of 265).

Next, Philadelphia Indemnity argues that applying the set-off would eviscerate Kinsey & Kinsey's coverage, rendering the policy a sham. *See* Philadelphia's Mem., at 16 (Dckt. No. 51).

---

[11] Bellin accuses Philadelphia Indemnity of speaking from both sides of its mouth. According to Bellin, Philadelphia "routinely take[s] the position" that Exclusion H "preclude[s]" its insured from breach-of-contract liability coverage. *See* Bellin's Mtn., at 12 (Dckt. No. 30). Specifically, Bellin points to a smattering of declaratory judgment actions that Philadelphia Indemnity filed. In those cases, Philadelphia Indemnity "claimed that Exclusion H barred coverage because the alleged liability arose from contractual obligations such that coverage is excluded under the Policy." *Id.* at 13–14 (cleaned up). Philadelphia Indemnity distinguishes those cases as "involving the law of another forum," and notes that often the defenses were not adjudicated and were "merely" asserted as "one of a list of defenses to coverage in the case." *See* Philadelphia's Mem., at 17 (Dckt. No. 51). For its part, the Court simply notes that Bellin's Exclusion H position should come as no surprise to Philadelphia Indemnity. After all, Philadelphia Indemnity has taken the same stance before.

To support its argument, Philadelphia Indemnity cites *Crum & Forster Specialty Ins., Inc. v. DVO, Inc.*, 939 F.3d 852, 854–58 (7th Cir. 2019). There, the Seventh Circuit explained that if a policy's purported coverage "proves to be illusory, a court may reform the policy to meet the insured's reasonable expectation of coverage." *Id.* at 855. The Court of Appeals was applying Wisconsin law, but Illinois law enshrines the same principle. *See Illinois Farmers Ins. Co. v. Keyser*, 956 N.E.2d 575, 578 (Ill App. Ct. 2011) ("We decline to adopt an [insurance policy] interpretation that would lead to illusory coverage.").

*Crum* does not move the needle. That case involved a professional liability insurance policy for a manufacturer. *See Crum*, 939 F.3d at 853–54. The policy covered a "wrongful act," which included a failure to provide "professional services," meaning "those functions performed for others by you or by others on your behalf that are related to your practice as a consultant, engineer, [or] architect." *Id.* at 854.

The policy promised coverage. But an exclusion then took it away. The exclusion removed coverage for liability arising from breach of an express, oral, or implied contract. *Id.* at 855. The exclusion was equal to, or greater than, the scope of coverage.

The Seventh Circuit found that the exclusion rendered the policy illusory, because claims of professional malpractice by third parties would necessarily "fall within the contract exclusion." *Id.* at 856, 859. The idea seems to be that every wrongful act (which would trigger coverage) would *also* be a breach of contract (which would eliminate coverage under the exclusion). In effect, the policy giveth and taketh away, leaving the insured with nothing.

*Crum* involved a situation where the coverage and the exclusion were co-extensive, with perfect overlap. "The overlap between claims of professional malpractice and breach of contract

is complete, because the professional malpractice necessarily involves the contractual relationship." *Id.* at 857.

That's not this case. The policy at hand did not include perfect overlap between the coverage and the exclusion. Again, the policy covered Kinsey & Kinsey for a "wrongful act," meaning a negligent act, a negligent error, or a negligent omission. And then, the policy contained an exclusion for breach of contract (with a carveout).

Coverage is not illusory because Kinsey & Kinsey could have caused harm through negligence without breaching the contract. Negligence *can* be a breach of contract, but negligence doesn't *have* to be a breach of contract. It was possible for Kinsey & Kinsey to cause harm to someone without breaching a contract, so coverage was not illusory.

The exclusion here is narrower than the exclusion in *Crum*, too. Here, the exclusion erased coverage for damages "arising out of" "any express warranties or guarantees or any liability [insured] assume[s] under contract *unless [insured] would have been legally liable in the absence of such contract.*" *See* Policy, Ex. A to Cplt. (Dckt. No. 1-1, at 33 of 86) (emphasis added).

In other words, the exclusion does not claw back coverage for claims arising out of breach of contract if the insured *would have been legally liable in the absence of the contract.* So, if Kinsey & Kinsey incurred liability for an act, and if that liability would exist even if no contract existed, then the fact that the act *also* breached a contract would not matter. If liability exists for *non*-contractual reasons, then the exclusion does not apply, even if liability also exists for contractual reasons.

In sum, after drawing all reasonable inferences in favor of Philadelphia Indemnity, the Court concludes that the state court judgment did not involve a covered claim. Liability did not

27

arise from a wrongful act.  Liability arose from a run-of-the-mill failure to perform under a contract.  Bellin's motion for judgment on the pleadings (Dckt. No. 30) is granted, and Philadelphia Indemnity's motion for judgment on the pleadings (Dckt. No. 45) is denied.

## II.    Bellin's Motion to Dismiss Kinsey & Kinsey's Crossclaim

The same conclusion applies to Bellin's motion to dismiss Kinsey & Kinsey's crossclaim.

To recap, Kinsey & Kinsey's crossclaim sought two forms of relief.  First, Kinsey & Kinsey sought "a declaratory judgment that the judgment of the Brown County Wisconsin court, in the amount of $750,000 plus costs and interest, is subject to a setoff of $1,000,000 for the Thome settlement, and that therefore, Bellin has no right to collect more."  *See* Kinsey & Kinsey's Counterclaim/Crossclaim, at ¶ 29 (Dckt. No. 10, at 10 of 11).  Second, Kinsey & Kinsey requested an injunction "barring any further efforts to enforce or collect on the judgment."  *Id.*

Kinsey & Kinsey essentially seeks the same declaratory judgment as Philadelphia Indemnity.  The result is the same, too.

Even accepting Kinsey & Kinsey's factual allegations as true, and drawing inferences in its favor, Kinsey & Kinsey does not state a claim for relief.  Bellin's motion to dismiss Kinsey & Kinsey's crossclaim is granted.

## III.   Philadelphia Indemnity's Motion to Dismiss Bellin's Counterclaim

One final motion remains.  Philadelphia Indemnity moved to dismiss Bellin's counterclaim for breach of contract.  The counterclaim is about the settlement agreement, and the implied covenant of good faith and fair dealing.

Wisconsin law applies because the settlement agreement contains a choice-of-law provision. *See* Settlement Agreement, Ex. C to Cplt., at ¶ 14 (Dckt. No. 4); *see also Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 705 (7th Cir. 2004) ("Illinois respects a contract's choice-of-law clause as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy."). To state a breach-of-contract claim under Wisconsin law, Bellin must allege (1) the existence of a contract between Philadelphia Indemnity and Bellin; (2) a breach of that contract; and (3) damages from the breach. *See Pagoudis v. Keidl*, 988 N.W.2d 606, 612 (Wis. 2023).

Bellin claims that Philadelphia Indemnity breached the settlement agreement by frustrating Bellin's attempts to collect the judgment. *See* Bellin's Counterclaim, at ¶¶ 46–60 (Dckt. No. 43). As Bellin sees it, Philadelphia Indemnity violated the implied covenant of good faith by making legal arguments and standing in the way of Bellin's ability to cash in.

Wisconsin law includes an implied covenant of good faith and fair dealing. *See First Bank & Tr. v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 325 n.10 (7th Cir. 2001) (citation omitted). "Wisconsin law further imparts a duty of cooperation between the parties to a contract." *See Designer Direct, Inc. v. DeForest Redevelopment Authority*, 313 F.3d 1036, 1046 (7th Cir. 2002); *see also Wis. Natural Gas Co. v. Gabe's Constr. Co.*, 582 N.W.2d 118, 121 (Wis. Ct. App. 1998).

"A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or *failure to cooperate in the other party's*

*performance*." *See Foseid v. State Bank*, 541 N.W.2d 203, 213 (Wis. Ct. App. 1995) (emphasis added). The issue at hand involves an alleged "failure to cooperate." *Id.*

The implied covenant of good faith is a rule of construction. *See In re Kmart Corp.*, 434 F.3d 536, 542 (7th Cir. 2006) ("This doctrine is a rule of construction, not a stand-alone obligation.") (Illinois law); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'"); *Kreckel v. Walbridge Aldinger Co.*, 721 N.W.2d 508, 514 (Wis. Ct. App. 2006) ("A party can be liable for breach of the implied covenant of good faith even though all the terms of the written agreement may have been fulfilled.") (cleaned up); *Shed v. Fraternal Enters. LP*, 2023 WL 3074876, at *7 (N.D. Ill. 2023) ("The implied covenant of good faith and fair dealing is not a free-wheeling obligation to treat people well, or deal with people fairly. It is a rule of construction when interpreting a discretionary term in a contract.") (Illinois law).

"[T]his covenant serves to guide construction of explicit terms of the agreement, particularly when gaps exist in the contract." *See First Bank & Trust v. Firstar Info. Serv's, Corp.*, 276 F.3d 317, 325 n.10 (7th Cir. 2001); *see also Wilson v. Career Educ. Corp.*, 729 F.3d 665, 675 (7th Cir. 2013) ("[T]he implied covenant of good faith is used as a construction aid to assist the Court in determining whether the manner in which one party exercised its discretion under the contract violated the reasonable expectations of the parties when they entered into the contract."). The implied covenant of good faith is a lens to interpret the terms of a contract. It is not a printing press to write new ones.

The idea is to prevent a party from taking advantage of the other party by exploiting a gap in a contract. The implied covenant of good faith prohibits acting in a way that the parties

would not have anticipated when they formed the contract. *See Kham*, 908 F.2d at 1357 ("'Good faith' is a compact reference to an implied understanding not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.").

That is, the implied covenant prohibits opportunistic behavior that deprives the other party of the benefit of the bargain. *See Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991); *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 803 (W.D. Wis. 2006) ("Under Wisconsin law, to state a claim for breach of duty of good faith, a plaintiff must allege facts 'that can support a conclusion that the party accused of bad faith has actually denied the benefit of the bargain originally intended by the parties.'") (citation omitted).

"A party may not . . . employ the good faith and fair dealing covenant to undo express terms of an agreement." *See Beidel v. Sideline Software, Inc.*, 842 N.W.2d 240, 251 n.24 (Wis. 2013). The implied covenant cannot "modify" a party's contractual obligations. *See Tele-Port, Inc. v. Ameritech Mobile Commc'ns, Inc.*, 637 N.W.2d 782, 859 (Wis. Ct. App. 2001) (applying Illinois but noting that Wisconsin law is the same); *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987) ("It is not a version of the Golden Rule, to regard the interests of one's contracting partner the same way you regard your own.").

Bellin claims that Philadelphia Indemnity breached that duty by engaging in "conduct, communications, and action that has hindered and obstructed Bellin's right to enforce the Wisconsin Judgment against Kinsey and collect the money that Bellin is owed by Kinsey." *See* Bellin's Counterclaim, at ¶ 52 (Dckt. No. 43). Specifically, "Philadelphia has brought and funded litigation against Bellin that is designed and intended to eliminate any such potential liability from Kinsey." *Id.* at ¶ 55.

31

The counterclaim then lists a bunch of filings by Philadelphia Indemnity in state court, and in this Court, that allegedly breached the duty to cooperate. *Id.* So Bellin wants its attorneys' fees. *Id.* at ¶ 60. The basic idea is that Philadelphia Indemnity has frustrated Bellin's ability to collect the judgment, by putting up legal roadblocks and resisting Bellin in court.

Bellin's theory quickly runs into trouble. As Philadelphia Indemnity points out, nothing in the settlement agreement prevented Philadelphia Indemnity from asserting its rights. The settlement agreement did not prevent Philadelphia Indemnity from arguing that the set-off applied to the state court judgment. And the settlement did not prevent Philadelphia Indemnity from funding Kinsey & Kinsey's litigation, either. When it came to the set-off, the settlement agreement kept everyone's powder dry.

Philadelphia Indemnity is not exploiting the settlement agreement in a manner that the parties could not have anticipated. It is not taking advantage of Bellin by manipulating a discretionary term, either. If anything, Philadelphia Indemnity is doing exactly what the settlement agreement anticipated: it is staking out a position on whether the set-off applies.

And the position is not surprising, either. Surely the parties anticipated that the insurance company would want credit for paying $1 million. Insurance companies don't like paying twice.

The implied covenant of good faith does not prevent a party from exercising express contractual rights. *See M&I Marshall & Ilsley Bank v. Schlueter*, 655 N.W.2d 521, 525 (Wis. Ct. App. 2002) ("[W]here the contracting party complains of acts of the other party that are specifically authorized in their agreement, we cannot see how there can be any breach of good faith and fair dealing."); *Kham*, 908 F.2d at 1357 ("Although courts often refer to the obligation of good faith that exists in every contractual relation . . . this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the

document.").  By the same token, the implied covenant of good faith does not prevent a party from *asserting* legal rights, either.

Bellin points to a provision in the settlement agreement that protected Bellin from getting roped into a dispute between Philadelphia Indemnity and Kinsey & Kinsey.  *See* Bellin Resp., at 5 (Dckt. No. 70).  That provision does not lend a hand.

Again, Philadelphia Indemnity financed a settlement between Bellin and one of the two Kinsey & Kinsey employees (Thome) – and did so *without* Kinsey & Kinsey's consent – even though the policy required consent.  The lack of consent created a risk that Bellin might get drawn into a dispute between Philadelphia Indemnity and Kinsey & Kinsey.

So the settlement agreement immunized Bellin from any liability if there is a dispute between the insurer and its insureds.  "Nothing in this Agreement obligates Releasor [Bellin] to defend Releasees [Philadelphia Indemnity and Thome] from a contractual, bad faith, or any other claim asserted by Brad Kinsey or Kinsey & Kinsey, Inc. against the Settling Parties [Bellin, Philadelphia Indemnity, and Thome] other than a contribution claim."  *See* Settlement Agreement, Ex. C to Cplt., at ¶¶ 10, 13 (Dckt. No. 4).

That provision does not mean what Bellin thinks it means.  The provision protected Bellin from liability if there is a dispute between Philadelphia Indemnity and Kinsey & Kinsey.  The provision did not promise that Philadelphia Indemnity would agree with Bellin on the applicability of the set-off.  The provision did not require Philadelphia Indemnity to stand down and roll over.

Bellin tries to back-in to an obligation by taking a circuitous route down a long and winding road.  As Bellin sees it, Bellin has protection from getting involved in a dispute between

33

Philadelphia Indemnity and Kinsey & Kinsey (true). But Bellin thinks that it is *already* involved, by proxy.

Bellin thinks that Philadelphia Indemnity is taking a position on the applicability of the set-off to avoid a fight with Kinsey & Kinsey. That is, Philadelphia Indemnity is arguing that the set-off applies to avoid a potential claim by Kinsey & Kinsey. If the set-off applies, then Kinsey & Kinsey owes nothing. In that case, Kinsey & Kinsey would have no reason to bring a claim against Philadelphia Indemnity. But if the set-off *doesn't* apply, then Kinsey & Kinsey has to pay $750,000. And then, Kinsey & Kinsey might come after Philadelphia Indemnity because it didn't consent to the settlement.

So, as Bellin sees it, Philadelphia Indemnity is arguing that the set-off applies, to avoid a dispute with Kinsey & Kinsey and protect itself from a possible claim. In effect, Philadelphia Indemnity is shifting litigation costs from itself (*i.e.*, costs that it would incur if Kinsey & Kinsey brought a claim), and is dumping them on Bellin (*i.e.*, by forcing Bellin to litigate the set-off). Or something along those lines.

That's a bit of a stretch, and then some. Suffice it to say that the settlement agreement protects Bellin from defending Philadelphia Indemnity in a dispute with Kinsey & Kinsey. But the settlement agreement does not prohibit Philadelphia Indemnity from taking positions that might prompt a dispute someday. And the settlement agreement does not tie Philadelphia Indemnity's hands when it comes to the applicability of the set-off.

The duty to cooperate is not a saving grace. The duty to cooperate "arises whenever the cooperation of one party is required for the performance of the other." *See Betco Corp., Ltd. v. Peacock*, 2016 WL 749460, at *6 (W.D. Wis. 2016); *see also Beidel v. Sideline Software, Inc.*, 2012 WI App 36 ¶ 15 (2012) (referring to the duty to avoid "interference with or failure to

cooperate *in the other party's performance*") (emphasis added) (citation omitted); Restatement (Second) of Contracts § 205, cmt. d (1981). It is not a wide-ranging prohibition on doing something that the other party views as uncooperative or unhelpful.

Philadelphia Indemnity's motion to dismiss Bellin's counterclaim is granted.

**Conclusion**

The motion knot is untangled. Bellin's motion for judgment on the pleadings (Dckt. No. 30) is granted. Philadelphia Indemnity's cross motion for judgment on the pleadings (Dckt. No. 45) is denied. In turn, Bellin's motion to dismiss Kinsey & Kinsey's crossclaim (Dckt. No. 27) for failure to state a claim is granted. Finally, Philadelphia Indemnity's motion to dismiss Bellin's counterclaim (Dckt. No. 55) is granted.

One final note. Kinsey & Kinsey filed a counterclaim against Philadelphia Indemnity. That sounds adversarial, but it really isn't. In its complaint against Bellin and Kinsey & Kinsey (as a nominal defendant), Philadelphia Indemnity asks for a declaration that the set-off applies. *See* Cplt. (Dckt. No. 1). By the same token, in its counterclaim against Philadelphia Indemnity, Kinsey & Kinsey asks for a declaration that the set-off applies. *See* Kinsey & Kinsey Counterclaim/Crossclaim, at 10 (Dckt. No. 10) (requesting a declaratory judgment that the state court judgment "is subject to a setoff of $1,000,000 for the Thome settlement").

Philadelphia Indemnity (in its complaint) and Kinsey & Kinsey (in its counterclaim) agree with each other that the set-off applies. The Court disagrees with both of them. For the reasons explained above, the Court *sua sponte* dismisses Kinsey & Kinsey's counterclaim against Philadelphia Indemnity.

Date:  September 29, 2023

Steven C. Seeger
United States District Judge